**Electronically Filed
Supreme Court
SCWC-16-0000810
29-JUN-2020
01:55 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---o0o---

_____

STATE OF HAWAI‘I,
Respondent/Plaintiff-Appellee,

vs.

MARK MEANS,
also known as MARK EDWARD MEANS,
Petitioner/Defendant-Appellant.

_____

SCWC-16-0000810

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000810; CR. NO. 15-1-0811)

June 29, 2020

Recktenwald, C.J., Nakayama, McKenna, Pollack, and Wilson, JJ.

OPINION OF THE COURT BY WILSON, J.

## I.    Introduction

This case arises from the arrest and conviction of Petitioner/Defendant-Appellant Mark Edward Means ("Means") for theft in the second degree by Shoplifting.  The Circuit Court of

the Second Circuit ("circuit court") sentenced Means as a repeat offender to a mandatory minimum of five years' incarceration without the possibility of parole. In sentencing Means to a mandatory minimum as a repeat offender, the circuit court did not require a jury to find that Means qualified as a repeat offender beyond a reasonable doubt as required by State v. Auld, 136 Hawai'i 244, 361 P.3d 471 (2015). The Intermediate Court of Appeals ("ICA") affirmed the conviction and sentence in a Summary Disposition Order ("SDO").

In Auld, this court held "that a jury is required to find that the defendant's prior conviction(s) have been proved beyond a reasonable doubt to trigger the imposition of a mandatory minimum sentence under [HRS § 706-606.5]." Id. at 257, 361 P.3d at 484. Although Auld was given "prospective effect only," it was published one day before Means was convicted and nearly a year before he was sentenced as a repeat offender. Id. Therefore, pursuant to Auld, Means' sentence violated his right to a jury determination as to whether he qualified to be sentenced as a repeat offender pursuant to HRS § 706-606.5.

Accordingly, the ICA's December 13, 2018 Judgment on Appeal is vacated, the circuit court's October 21, 2016 sentence is vacated, and Means' case is remanded to the circuit court for resentencing in conformance with Auld.

## II. Background

### A. Circuit Court Proceedings

On September 8, 2015, Means was charged by felony information with the offense of theft in the second degree by Shoplifting, in violation of Hawai'i Revised Statutes ("HRS") § 708-831(1)(b).[1] The incident took place on September 2, 2015 at the Sears department store in Queen Ka'ahumanu Mall on Maui, and involved the theft of a tent, a tool set, and a multimeter[2] with a total aggregated value exceeding $300.00.

### 1. Trial

At trial, the State presented testimony from Arthur Wake ("Wake"), an asset protection manager at the Sears department store in Queen Ka'ahumanu Mall on Maui and from

---

[1] At the time, HRS § 708-831(1)(b) (2014) provided:

(1)  A person commits the offense of theft in the second degree if the person commits theft: . . .

    (b)  Of property or services the value of which exceeds $300 . . . .

HRS § 708-833.5 (2014) provided:

A person convicted of committing the offense of shoplifting as defined in section 708-830 shall be sentenced as follows:

    (1) In cases involving property the value or aggregate value of which exceeds $300; as a class C felony, provided that the minimum fine shall be four times the value or aggregate value involved . . . .

[2] A multimeter is a device used to find the voltage in a circuit.

Officer Ashley Gandauli of the Maui Police Department ("MPD"), among others.[3]

Wake testified that he observed Means on Sears' security cameras as Means carried various items, including a Northwoods brand tent and a DeWalt brand tool set, toward Sears' automotive exit. Wake positioned himself outside the store's automotive exit and intercepted Means when he walked out. Wake testified that he identified himself to Means as Sears asset protection and asked for the items back. Means put the items on the ground and began to walk away. Wake called the Maui Police Department ("MPD"), told them what had happened, and gave them a description of Means and the direction he was going.

Wake testified that he subsequently returned to the automotive exit of Sears and recovered the items that Means left on the ground. He took a photograph of the items; that photograph, showing the tent, the multimeter, and the tool set, was admitted into evidence. The items in the photograph do not bear any tags or labels indicating their value. The tool set and the multimeter were covered in security devices called

---

[3]     The Honorable Joseph E. Cardoza presided.

"spider wrap" that Wake testified is standard for Sears merchandise priced $99.99 and above.[4]

Wake worked with another Sears employee to produce a receipt to show the prices of the items. He identified State's Exhibit No. 4 as the receipt that was made for the MPD officers; the receipt lists the prices of the tool set, the multimeter, and the camping tent. Wake testified that the receipt was "a true and accurate receipt for those items[,]" but that he was not the person who generated the receipt. Instead, a "hub associate[,]" who Wake did not know,[5] rang up the merchandise because asset protection is not allowed to touch the registers.[6]

Defense counsel objected to the receipt being entered into evidence, arguing that it had not been properly authenticated due to the fact that Wake had no knowledge of the system and the person who rang up the items was unknown. Defense counsel also argued the receipt was inadmissible hearsay evidence.

---

[4] Spider wrap consists of a noise-making device and some wire; if the wire is pulled on or cut, an alarm will go off on the device. When an item is purchased, the spider wrap is deactivated and removed by a sales associate.

[5] Wake testified that he could identify the associate by looking up the "associate number" on the receipt.

[6] Wake testified that although he had "very little experience" with the registers, he did have some because he had previously been an electronics associate for about three months.

5

The court allowed the prosecutor to supplement the foundation for introduction of the receipt by having Wake provide further testimony regarding the process used to produce the receipt. Wake testified that in order to produce a receipt, he called his "ASM," who is a manager, to the hub office, and the manager produced the receipt by scanning the merchandise at an office register used for complex returns and for generating receipts after theft incidents. Wake testified that he was personally present at the time the receipt was produced.[7]

Defense counsel renewed his objection to admitting the receipt. The court indicated that in order for the receipt to be admissible, it would be helpful to have testimony that the prices on the receipt were accurate.

Wake testified that he knew the retail price of the items because he viewed the receipt and also because he had a "rough idea" of their cost from walking around the floor of the store and viewing the posted prices. The prosecutor next asked him: "on September 2nd, 2015, what was the posted -- price that was posted near or on these items?" Although the defense objected to the question, the objection was overruled and Wake responded that the tool set cost $219.99, the multimeter cost

---

[7] Although Wake described the person who produced the receipt as an "associate," a "manager," and an "ASM," the record indicates that Wake used these three terms interchangeably to refer to the same person.

6

$169.99, and the tent cost $129.99.  He testified again that the receipt was produced by a manager, who scanned the items at the register in the hub location, that the manager would be trained in the procedures of producing a receipt according to Sears' protocol and the manufacturer's specifications, and that he personally witnessed the manager produce the receipt.  The prosecution asked to submit the receipt into evidence.  Defense counsel again objected, and the court overruled the objection and admitted the receipt.

Wake identified the three items on the receipt and again listed their prices:  $129.99 for the tent, $169.99 for the multimeter, and $219.99 for the tool set, for a total of $519.97.  He testified that the sales price for the tent was posted directly below the tent and that the price for the tool set was posted below the tool set.[8]

Ashley Gandauli ("Officer Gandauli"), a patrol officer with the MPD, also testified for the prosecution.  Officer Gandauli testified that she received a call from dispatch about a theft in progress incident in the area of Sears and was subsequently able to locate and detain Means.

---

[8]     Wake testified that the tent would have been on a shelf with other tents of the same type and price, and different tents that might have been different prices would have been on different shelves.  Wake noted, however, that he did not personally know where the tent Means took was located before Means picked it up.

On cross-examination, defense counsel asked Officer Gandauli whether she had made a notation of any address for Means in her report.  The prosecution objected that the question did not call for relevant evidence; at a bench conference, the prosecutor argued that the defense was getting into character evidence and that if they brought in evidence that Means was homeless, it would open the door for the State to bring in evidence that he was homeless and unemployed "and all of these other things about his background and character."  The court stated that the information about Means "may relate to his ability to have intended to pay for the merchandise."  Defense counsel stated that he would not ask if Means was homeless and would limit his questions to whether Officer Gandauli noted an address or that Means was unemployed on the police report, which would limit the evidence to what was in the report.  The court allowed the questions.

Defense counsel then asked Officer Gandauli if she entered an address on the police report.  Officer Gandauli said she did not.  Defense counsel asked her, "[w]hy was that?" and Officer Gandauli said, "[h]e stated that he was homeless; that he did not have a local address."  Defense counsel told the court he "didn't ask for that, but now it's out."  The court said defense counsel did ask for it because he asked the officer

why she didn't enter an address.  Defense counsel stated he had no objection to the answer and that "I am quite happy" with it.

### 2.    Closing Arguments and Verdict

During the defense's closing argument, defense counsel argued that Means was guilty of shoplifting, but that he did not have the requisite state of mind to be found guilty of theft in the second degree because he did not know that the aggregate value of the items was greater than $300.[9]  During closing arguments, Defense counsel made two references to the fact that Means was homeless.  Near the beginning of his argument, defense counsel said, "[d]uring the trial, we saw several things, we learned several things.  We learned Mark is homeless."  Later in the closing argument, defense counsel referenced Means' homelessness again:

> Mark's not an electronic calculator, and he's not a cash register.  He's a homeless man who, apparently, went into Sears seeking shelter --
>
> [Prosecutor]:  Objection, Your Honor.  Not substantiated by the evidence.
>
> THE COURT:  The objection is sustained.
>
> [Defense Counsel]:  Mark is a homeless man that is clearly taking a tent for whatever purpose he would -- a homeless person would take a tent.
>
> There is no -- it's very doubtful that Mark actually knew the aggregate value of the three items that he

---

[9]    "[I]n order to convict a defendant of theft in the second degree, in violation of HRS §§ 708-830(8)(a) and 708-831(1)(b), the prosecution must prove beyond a reasonable doubt that the accused intended to steal property or services valued in excess of $300.00."  State v. Cabrera, 90 Hawai'i 359, 369, 978 P.2d 797, 807 (1999).

> selected, and then later, as eloquently pointed out by the officer, deselected when he was confronted by Sears security.  That's in doubt.  That's in reasonable doubt.

Defense counsel argued that Means did not know that the value of the items he took was over $300, but that it was reasonable to assume he knew the value of the items were over $100.  Accordingly, the defense asked that the jury to find Means guilty of theft in the third degree,[10] rather than theft in the second degree, because Means did not know that he was stealing property in excess of $300.

On November 25, 2015, Means was found guilty as charged of theft in the second degree.

### 3. Following the Publication of State v. Auld on November 24, 2015, Prior Convictions Must be Proved to a Jury Beyond a Reasonable Doubt in Order to Sentence a Defendant as a Repeat Offender.

The Hawai'i Supreme Court published its opinion in State v. Auld on November 24, 2015, while Means' jury trial was ongoing but before he was convicted.  Auld, 136 Hawai'i 244, 361 P.3d 471.  Auld held that "the State, in seeking to sentence a defendant to a mandatory minimum sentence as a repeat offender

---

[10] At the time, HRS § 708-832(1)(a) (2014) provided:

(1) A person commits the offense of theft in the third degree if the person commits theft:

(a) Of property or services the value of which exceeds $100 . . . .

under [HRS § 706-606.5], (1) must include the defendant's predicate prior convictions in a charging instrument; and (2) must prove these prior convictions to a jury, beyond a reasonable doubt."  Id. at 246-47, 361 P.3d at 473-74.  Because the Auld court found that repeat offender sentencing under HRS § 706-606.5 enhances the penalty of the crime committed, the court held that the prior convictions upon which a defendant's increased mandatory minimum sentence is predicated (referred to as "predicate prior convictions" by the Auld court) must be alleged in the charging instrument and found by a jury beyond a reasonable doubt.  Id. at 247-48, 361 P.3d at 474-75.

The holding in Auld was given "prospective effect only[,]" meaning that the "rule is applied neither to the parties in the law-making decision nor to those others against or by whom it might be applied to conduct or events occurring before that decision[.]"  Id. at 255-57, 361 P.3d at 482-84.

**4.    Sentencing**

On February 10, 2016, the State filed a motion for imposition of a mandatory minimum term of imprisonment of five years without the possibility of parole, pursuant to HRS § 706-606.5.  At the time, HRS § 706-606.5(1)(c)(iv) (2014) provided that a person convicted of theft in the second degree who had three or more felony convictions in this or another jurisdiction

11

was to be sentenced to a mandatory minimum of five years imprisonment.[11]

In a declaration attached to the motion for imposition of mandatory minimum term of imprisonment, the prosecutor asserted that Means had been previously convicted in Florida of Grand Theft (Motor Vehicle), Burglary of a Structure, and Grand Theft, all three of which are felonies under Florida law. The State argued that it was the court, rather than the jury, that was required to determine whether Means was subject to mandatory minimum sentencing as a repeat offender. The State's

---

[11] HRS § 706-606.5 (2014) provides in relevant part:

(1) Notwithstanding section 706-669 and any other law to the contrary, any person convicted of . . . any of the following class C felonies:

. . . .

Section 708-831 relating to theft in the second degree;

. . . .

and who has a prior conviction or prior convictions for the following felonies, including . . . any of the class C felony offenses enumerated above, or any felony convictions of another jurisdiction, shall be sentenced to a mandatory minimum period of imprisonment without possibility of parole during such period as follows:

. . . .

(c) Three or more prior felony convictions:

. . .

(iv) Where the instant conviction is for a class C felony offense enumerated above -- five years.

12

declaration noted that this court's decision in Auld—which required a jury to find whether a defendant has prior convictions that would trigger the imposition of a mandatory minimum sentence as a repeat offender—had been published on November 24, 2015, after Means' case was charged, and after the jury had been sworn and witness testimony had begun.  The State argued that Auld did not apply to Means' case because "Auld's holding has 'purely prospective effect,' meaning 'the rule is applied neither to the parties in the law-making decision [i.e., the defendant Auld] nor to those others against or by whom it might be applied to conduct or events occurring before that decision[.]'"

In opposition, Means argued that, under Auld, the jury must find the facts necessary to show that he was subject to repeat offender sentencing under HRS § 706-606.5.  Means noted that the jury in this case was empaneled on November 23, 2015, was still empaneled on November 24, 2015, when Auld was published, and was not excused until after it reached a verdict on November 25, 2015.  Means argued that there was therefore ample opportunity for the court to have the jury decide the fact of his predicate prior convictions before the jury was excused. Separately, Means filed a "motion/demand" that a jury be empaneled to decide the issue of predicate prior convictions.

The State submitted its memorandum in opposition to Means' motion/demand that a jury be empaneled in which it argued that Means' claim that he could still be given a jury trial on the issue of his prior qualifying felonies "fl[ew] in the face" of the Supreme Court's statement that Auld would have purely prospective effect. The State argued that Auld's prospective application did not apply to Means because Means had committed the offense and been charged, the trial had commenced, and the jury had already been sworn prior to the date Auld was published.

Means filed a reply, arguing that Auld did apply to his sentencing because the sentencing proceedings, as well as his demand that a jury decide the issue of predicate prior convictions, were an "event" that occurred after Auld was decided.

At the hearing on Means' motion/demand that a jury be empaneled to establish his prior convictions, the circuit court stated that Auld "does not trigger [the] requirement that the defendant be entitled to a trial by jury or a charge given the chronology of the -- of this case[.]" The circuit court

subsequently denied Means' motion without providing any further reasoning.[12]

At a sentencing hearing on October 21, 2016, the circuit court found that Means had been convicted of three prior felonies and concluded that Means was a repeat offender as defined by HRS § 706-606.5 and subject to the mandatory minimum for a person having three prior convictions. Means was sentenced to a mandatory minimum term of imprisonment of five years without possibility of parole, with credit for time served, plus payment of a crime victim compensation fee and a fine of $2,079.88. Means appealed his conviction to the ICA.

**B.   ICA Appeal**

On appeal, Means argued:  (1) that he was denied effective assistance of counsel because his attorney introduced evidence that he was homeless and unemployed at the time of the incident; (2) that the circuit court erred in allowing Wake to testify to the value of the stolen items and in admitting into evidence a receipt showing the value of such items; and (3) that the circuit court "erred in failing to submit the proof of prior convictions to a jury pursuant to State v. Auld."  The ICA affirmed Means' conviction and sentence.  State v. Means, No.

---

[12]    Means subsequently filed a new memorandum in opposition to the State's motion for imposition of a mandatory minimum term, but his arguments were based on the legal representation he received in his prior Florida cases and on claimed mitigating circumstances, not on Auld.

15

CAAP-16-0000810, 2018 WL 5839546, at *2 (App. Nov. 8, 2018) (SDO). The ICA held, inter alia, that (1) Means was not deprived effective assistance of counsel; (2) that the circuit court did not err in receiving into evidence the receipt that Wake produced; and (3) that Auld's requirement that the State prove the fact of prior convictions to a jury beyond a reasonable doubt did not apply in Means' case because "Means' Felony Information was filed on September 8, 2015, more than two months before Auld was issued." Id. at *5.

### III. Standards of Review

#### A. Ineffective Assistance of Counsel

If the issue of ineffective assistance of counsel is first raised on appeal, the appellate court may consider the merits of the appeal de novo if the record "is sufficiently developed to determine whether there has been ineffective assistance of counsel[.]" State v. Silva, 75 Haw. 419, 439, 864 P.2d 583, 592 (1993).

#### B. Admissibility of Evidence

"When a question arises regarding the necessary foundation for the introduction of evidence, the determination of whether proper foundation has been established lies within the discretion of the trial court, and its determination will not be overturned absent a showing of clear abuse." State v.

16

Villena, 140 Hawai'i 370, 376, 400 P.3d 571, 577 (2017) (quoting State v. Eid, 126 Hawai'i 430, 440, 272 P.3d 1197, 1207 (2012)).

"We review the admissibility of evidence pursuant to [Hawai'i Rules of Evidence ("HRE")] Rule 803 under the right/wrong standard, because the requirements of the rules dealing with hearsay are such that application of the particular rules can yield only one correct result." State v. Wakisaka, 102 Hawai'i 504, 514, 78 P.3d 317, 327 (2003) (quoting State v. Yamada, 99 Hawai'i 542, 550, 57 P.3d 467, 475 (2002) (internal quotation marks and brackets omitted)).

C.   **Constitutional Questions**

"We answer questions of constitutional law by exercising our own independent constitutional judgement based on the facts of the case.  Thus, we review questions of constitutional law under the right/wrong standard." State v. Pratt, 127 Hawai'i 206, 212, 277 P.3d 300, 306 (2012).

**IV.  Discussion**

A.   **Means Was Not Denied His Constitutional Right To Effective Assistance Of Counsel When His Trial Counsel Adduced Evidence That He Was Homeless And Unemployed At The Time Of The Incident.**

Means' contention that he was deprived of his constitutional right to effective assistance of counsel because his trial counsel adduced evidence that he was homeless and unemployed at the time of the theft is unpersuasive.  The

17

decision to adduce evidence of his homelessness and unemployment was part of a trial strategy that had an obvious basis for benefitting the defense.

The right to the effective assistance of counsel in a criminal case is guaranteed under article I, section 14 of the Hawai'i Constitution and the Sixth Amendment to the United States Constitution. This court has articulated the test for the constitutional adequacy of defense counsel's assistance as follows:

> When reviewing a claim of ineffective assistance of counsel, this court looks at whether defense counsel's assistance was within the range of competence demanded of attorneys in criminal cases. The defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. To satisfy this second prong, the defendant needs to show a possible impairment, rather than a probable impairment, of a potentially meritorious defense. A defendant need not prove actual prejudice.

Wakisaka, 102 Hawai'i at 513-14, 78 P.3d at 326-27 (internal quotation marks, citations, and footnote omitted). Thus, in order to prove a violation of this right, the defendant bears the burden of proof on two elements: "1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." Id. at 514, 78 P.3d at 327.

Counsel's assistance "need not be errorless," State v. Antone, 62 Haw. 346, 348, 615 P.2d 101, 104 (1980), but must be merely "within the range of competence demanded of attorneys in criminal cases[,]" State v. Kahalewai, 54 Haw. 28, 30, 501 P.2d 977, 979 (1972). Further, "[s]pecific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny." Briones v. State, 74 Haw. 442, 462-63, 848 P.2d 966, 976 (1993); accord State v. Salavea, No. SCWC-16-0000386, 2020 WL 3397791, at *10 (Haw. June 19, 2020).

Here, the transcript of defense counsel's cross-examination of Officer Gandauli reflects that the evidence of Means' homelessness and unemployment was adduced by defense counsel as part of a trial strategy that had an obvious basis for benefitting Means' defense. Defense counsel asked Officer Gandauli whether she entered an address for Means' residence on the police form, and when she responded that she did not, defense counsel asked her "why?" Officer Gandauli responded, "[h]e stated that he was homeless; that he did not have a local address." The court asked defense counsel if he intended to object to that answer, to which defense counsel responded that he did not have an objection to Officer Gandauli's response, and that he was actually "quite happy" with it. Defense counsel clearly intended to elicit testimony that Means was homeless, in

19

an apparent effort to show that Means lacked the intent to commit theft in the second degree because he did not know that the items he took from Sears were valued in excess of $300.

A conviction of theft in the second degree pursuant to HRS § 708-831(1)(b) (2014) requires that the defendant intentionally or knowingly commit theft of property valued in excess of $300. See State v. Mitchell, 88 Hawai'i 216, 223, 965 P.2d 149, 156 (1998) (noting that "[i]n order to establish a defendant's culpability for second degree theft, therefore, the State must prove that a defendant intended to steal the statutorily defined value, in this case $300").

During closing argument, defense counsel twice referenced the fact that Means was homeless and told the jury that Means was not "an electronic calculator" or "a cash register" and that he "clearly" took the tent "for whatever purpose . . . a homeless person would take a tent." Arguing that Means knew the items were worth over $100, but not over $300, defense counsel asked the jury to return a verdict of guilty of third degree shoplifting.

Defense counsel's overall strategy is evident from the record. Given the strength of the evidence against Means, defense counsel's decision to elicit testimony about Means' homelessness, in an effort to paint Means in a sympathetic light and portray him as someone who was seeking shelter and who would

20

not have considered (or been aware of) the value of the tent and other items that he took, had an obvious tactical basis for benefitting Means' defense and counsel's decision to adduce this evidence will accordingly not be subject to further scrutiny. Briones, 74 Haw. at 462-63, 848 P.2d at 976.

**B.    The Receipt Was Admissible Evidence Because The Prosecution Laid The Proper Foundation For Admission And It Qualified For Admission Under The Business Records Exception To The Hearsay Rule.**

Means argues that the circuit court abused its discretion when it admitted into evidence the receipt that Wake produced. HRS § 708-830(8) provides that in shoplifting cases, "printed register receipts shall be prima facie evidence of value and ownership of such goods or merchandise."[13] Although "printed register receipts" are prima facie evidence of value, the evidence must still be admissible under the Hawai'i Rules of Evidence.

In order to be admissible, documentary evidence such as a printed register receipt must be authenticated or identified "by evidence sufficient to support a finding that the matter in question is what its proponent claims." HRE Rule 901. In this case, Wake authenticated the receipt by providing

---

[13]    Pursuant to HRE Rule 305, "[a] statute providing that a fact or a group of facts is prima facie evidence of another fact establishes a presumption within the meaning of this article unless the statute expressly provides that such prima facie evidence is conclusive."

testimony sufficient to support a finding that it was, as the prosecution claimed, a receipt listing the prices of the three items shoplifted by Means.[14]  Wake's testimony was sufficient to authenticate the receipt because it was "sufficient proof . . . so that a reasonable juror could find in favor of authenticity or identification."  State v. Loa, 83 Hawai'i 335, 350, 926 P.2d 1258, 1273 (1996) (quoting State v. Joseph, 77 Hawai'i 235, 239 883 P.2d 657, 661 (App. 1994)).

Evidence, even if properly authenticated, cannot be admitted if it is hearsay.  HRE Rule 802.  Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  HRE Rule 801.  "[A]n assertion in writing" is a statement for hearsay purposes.  Id. The receipt met the definition of hearsay because it was an out-of-court statement asserting the prices of the items, offered to prove the truth of the matter asserted.

The receipt qualified for admission as a hearsay statement under HRE Rule 803(b)(6) as a business record:

---

[14]    Wake personally identified the receipt and testified that:  it was a true and accurate receipt for the items; an associate or manager who was trained to produce receipts produced the receipt by scanning the items at an office register as he watched; he also had personal experience and some training on using the registers because he was briefly employed an electronics associate; and the person who produced the receipt followed the same procedure that Wake had been trained to use.

22

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made in the course of a regularly conducted activity, at or near the time of the acts, events, conditions, opinions, or diagnoses, as shown by the testimony of the custodian or other qualified witness, or by certification that complies with rule 902(11) or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness.

HRE Rule 803(b)(6). The receipt was a "record" of "conditions" (the prices of the items on September 2, 2015) made in the course of "a regularly conducted activity[,]"[15] "at or near the time" of the "events[,]"[16] as shown by the testimony of a "qualified witness" (Wake). Id.

Moreover, once admissible under an exception to the rule against hearsay, a printed register receipt is prima facie evidence of value or ownership in shoplifting cases pursuant to HRS § 708-830(8). 2001 Haw. Sess. Laws Act 87, § 1 at 138.[17]

---

[15] Wake testified that the office register was regularly used for generating receipts for theft incidents.

[16] The receipt was produced on September 2, 2015, the same day as the theft.

[17] Act 87, HRS § 708-830(8) (2001) provided:

> The unaltered price or name tag or other marking on goods or merchandise, or duly identified photographs or photocopies thereof, or printed register receipts, shall be prima facie evidence of value and ownership of such goods or merchandise. Photographs of the goods or merchandise involved, duly identified in writing by the arresting police officer as accurately representing such goods or merchandise, shall be deemed competent evidence of the

(continued . . .)

The legislative history establishes that, so long as it is properly admitted, a printed register receipt is evidence of the value of merchandise.  See H. Stand. Comm. Rep. No. 1519, in 2001 House Journal, at 1693 ("The statutory requirement for proof of value in theft cases has not kept pace with the technology of recordkeeping of prices for merchandise stock. With proper evidentiary foundation, photocopies of price tags and printed register receipts are reliable evidence of value[.]").

The legislature established that printed record receipts constitute prima facie evidence of value or ownership when the receipt is properly admitted as evidence.  Here, the receipt was properly admitted as a business record pursuant to HRE Rule 803(b)(6) and accordingly constituted prima facie evidence of the value and ownership of the items stolen from Sears in this incident.[18]

---

(continued . . .)

> goods or merchandise involved and shall be admissible in any proceedings, hearings, and trials for shoplifting, to the same extent as the goods or merchandise themselves.

[18]    Prior to the receipt being admitted into evidence, the State attempted to establish the prices of the items through the testimony of Wake. In doing so, the State repeatedly asked Wake about the prices for the items taken by Means.  The defense made repeated hearsay objections, arguing that Wake was not testifying from his personal knowledge.  As noted, the receipt was properly admitted to establish the value of the items stolen.  Thus, any error arising from the improper admission of Wake's testimony, was harmless. See State v. Bannister, 60 Haw. 658, 660, 594 P.2d 133, 134 (1979) (holding

(continued . . .)

**C.    Means Was Entitled To A Jury Determination As To Whether His Prior Convictions Supported The Imposition Of A Mandatory Minimum Sentence As A Repeat Offender.**

In his final point of error, Means correctly contends that the circuit court erred in sentencing him as a repeat offender without requiring the State to prove the proffered predicate prior convictions to a jury beyond a reasonable doubt. Auld identified two separate requirements to establish mandatory minimum sentencing of repeat offenders:  "the State, in seeking to sentence a defendant to a mandatory minimum sentence as a repeat offender under [HRS § 706-606.5], (1) must include the defendant's predicate prior convictions in a charging instrument; and (2) must prove these prior convictions to a jury, beyond a reasonable doubt."  136 Hawai'i at 246-47, 361 P.3d at 473-74.  Here, Means argues that he was improperly denied the protections of Auld mandating "that a jury is required to find that the defendant's prior conviction(s) have been proved beyond a reasonable doubt to trigger the imposition of a mandatory minimum sentence under [HRS § 706-606.5]."  Id.

The Auld court recognized that its holding announced new rules for repeat offender charging and sentencing, and

_____

(continued . . .)

that "[t]estimony based on information supplied by another person that is not in evidence is inadmissible").

25

considered whether the new rules should be given purely prospective, limited retroactive, or full retroactive effect:

> [W]e consider whether these new rules will be given:
>
> > (1) purely prospective effect, which means that the rule is applied neither to the parties in the law-making decision nor to those others against or by whom it might be applied to conduct or events occurring before that decision; (2) limited or "pipeline" retroactive effect, under which the rule applies to the parties in the decision and all cases that are on direct review or not yet final as of the date of the decision; or (3) full retroactive effect, under which the rule applies both to the parties before the court and to all others by and against whom claims may be pressed.

Id. at 255–56, 361 P.3d at 482–83 (quoting State v. Jess, 117 Hawai'i 381, 401, 184 P.3d 133, 153 (2008)).  After noting that Auld expressly overturned prior appellate precedent, this court gave the new rules "prospective effect only."  Id. at 257, 361 P.3d at 484.  Auld was given prospective-only application because it announced new rules that changed how "parties may previously have regulated their conduct":

> The "paradigm case" warranting a prospective-only application of a new rule arises "when a court expressly overrules a precedent upon which the contest would otherwise be decided differently and by which the parties may previously have regulated their conduct.

Id. at 256, 361 P.3d at 483 (quoting State v. Jess, 117 Hawai'i 381, 400, 184 P.3d 133, 152 (2008)).  Thus, the prospective-only application arises when a new rule changes how "parties may previously have regulated their conduct."  Id.

The ICA incorrectly concluded that because Means' charging document was filed before November 24, 2015 (the date

26

of Auld's publication), Auld's requirement that a jury decide whether prior convictions qualify a defendant for mandatory minimum sentencing did not apply to Means.  The ICA overlooked the fact that Auld announced two new requirements, each with its own triggering event.  See Auld, 136 Hawai'i at 257, 361 P.3d at 484.  Had Means sought to apply the Auld requirement that the State must "include the defendant's predicate prior convictions in a charging instrument[,]" the ICA would have been correct to determine that the prospective-only application did not apply to Means' case because he was charged (the triggering event) prior to the publication of Auld.  Id.  Here, however, Means seeks to apply the Auld requirement that the State "prove [the predicate] prior convictions to a jury, beyond a reasonable doubt."  Id.  Accordingly, because the triggering event for this requirement is the start of sentencing proceedings, which in Means' case did not begin until Means was convicted on November 25, 2015, a day after Auld was published, a jury finding as to predicate prior convictions was required to impose a mandatory minimum sentence upon Means.[19]

---

[19]    Auld specifically stated:

As to how repeat offender sentencing procedures would look in the future, this court has suggested that information pertaining to sentencing may be introduced after the guilt phase of the trial has concluded.  See Jess, 117 Hawai'i at 412, 184 P.3d at 164 (citing State v. Janto, 92 Hawai'i 19, 34-35, 986 P.2d 306, 321-22 (1999)).  This is apparently

(continued . . .)

Auld provides that defendants have a constitutional right to have sentencing enhancements (including mandatory minimum sentencing based on prior convictions) proven to a jury beyond a reasonable doubt so long as that due process does not require the court or the parties to revisit already regulated "conduct or events." Id. at 255, 361 P.3d at 482.[20] Here, "conduct or events" applies to the beginning of the sentencing phase of Means' trial. Because the parties in Means' case had not regulated their conduct with respect to sentencing prior to the publication of Auld, the "conduct or events" of sentencing were prospective.

---

(continued . . .)

> the procedure described in [State v. ]Keohokapu, [127 Hawai'i 91, 276 P.3d 660 (2012)] where the jury heard testimony concerning the offenses leading to defendant's prior convictions during the extended term sentencing phase of the trial. 127 Hawai'i at 96-101, 276 P.3d at 665-70. As with other constitutional rights, the defendant would also have the option of waiving a jury trial for repeat offender sentencing fact-finding, similar to the waiver option for extended term sentencing fact-finding. See HRS § 706-664(1) ("[T]he defendant shall have the right to hear and controvert the evidence against the defendant and to offer evidence upon the issue [of extended term sentencing] before a jury; provided that the defendant may waive the right to a jury determination under this subsection, in which case the determination shall be made by a court."). We do not foresee future changes to repeat offender sentencing procedures to be markedly different from extended term sentencing procedures.

Auld, 136 Hawai'i at 256-57, 361 P.3d at 483-84.

[20] Auld did not explain the meaning of the phrase "conduct or events[.]" Id. at 255-56, 361 P.3d at 482-83.

Neither the circuit court nor the parties had begun regulating their conduct as it related to sentencing prior to the issuance of the Auld decision because Means' sentencing phase had not begun at the time Auld was published.[21]  The court, therefore, could have afforded Means the constitutional protections mandated by Auld without revisiting "previously [] regulated conduct."  Prior to the "conduct" of Means' sentencing, both the State and the court were aware of Auld's constitutional mandate and Means demanded that they follow it.[22]

Because Means had been charged, but not yet convicted or sentenced at the time Auld was published, Means was entitled to the protections of Auld.  Accordingly, the State was required to prove Means' predicate prior convictions to a jury beyond a reasonable doubt prior to imposition of a mandatory minimum sentence as a repeat offender.

---

[21]  The sentencing phase of Means' case (the triggering event for Auld's requirement of a jury finding to support mandatory minimum sentencing based on repeat offender status) did not begin until after the jury verdict on November 25, 2015, a day after the publication of the Auld decision. Therefore, the "conduct or events" that triggered the due process protections of Auld took place after Auld was published.  Accordingly, Auld should have been applied prospectively to the sentencing phase of Means' case, requiring a jury to find that Means' prior convictions were sufficient to support the imposition of mandatory minimum sentencing as a repeat offender.

[22]  The circuit court acknowledged the possibility that it would need to empanel a jury to decide whether Means' previous convictions qualified him for the imposition of mandatory minimum sentencing as a repeat offender. During oral arguments on the State's Motion for Imposition of Mandatory Minimum Sentencing, Means requested a hearing on his demand for a jury to decide the issue of predicate prior convictions.  The circuit court agreed to the hearing and said, "depending on what happens there, we either set it for trial by jury on the question or proceed to a [sentencing] hearing."

## V. Conclusion

The ICA's December 13, 2018 Judgment on Appeal is vacated, Means' sentence is vacated, and the case is remanded to the circuit court for resentencing in accordance with this opinion.[23]

Randall K. Hironaka
for Petitioner

Peter A. Hanano
for Respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson



---

[23] It bears noting that Means was sentenced to five years imprisonment on October 21, 2016, the term of which is likely to expire before October 21, 2020 when factoring in credit for time served. Means has likely been in custody since his arrest on September 2, 2015.